# Exhibit C



What's New · What's Next · Site Map · A-Z Index · FAQs · Careers · RSS          Search  Advanced Search

| About the Fed | News & Events | Monetary Policy | Banking Information & Regulation | Payment Systems | Economic Research & Data | Consumer Information | Community Development | Reporting Forms | Publications |

- Testimony and Speeches
- Press Releases
- Regulatory Reform
- Conferences
- Other Public Communication

Home > News & Events > 2007 Testimony

# Testimony

Print

### Chairman Ben S. Bernanke
*Subprime mortgage lending and mitigating foreclosures*
Before the Committee on Financial Services, U.S. House of Representatives
September 20, 2007

Chairman Frank, Ranking Member Bachus, and members of the Committee, I am pleased to appear before you to discuss the origins of the problems in the subprime-mortgage market and the response of the Federal Reserve to these developments. I will also discuss some possible legislative options for addressing these concerns.

**Recent Developments in the Subprime-Mortgage Sector**
Let me begin with some background on the subprime-mortgage sector. Subprime mortgages are loans intended for borrowers who are perceived to have high credit risk. Although these mortgages emerged on the financial landscape more than two decades ago, they did not begin to expand significantly until the mid-1990s. The expansion was fueled by innovations--including the development of credit scoring--that made it easier for lenders to assess and price risks. In addition, regulatory changes and the ongoing growth of the secondary mortgage market increased the ability of lenders, who once typically held mortgages on their books until the loans were repaid, to sell many mortgages to various intermediaries, or "securitizers." The securitizers in turn pooled large numbers of mortgages and sold the rights to the resulting cash flows to investors, often as components of structured securities. This "originate-to-distribute" model gave lenders (and, thus, mortgage borrowers) greater access to capital markets, lowered transaction costs, and allowed risk to be shared more widely. The resulting increase in the supply of mortgage credit likely contributed to the rise in the homeownership rate from 64 percent in 1994 to about 68 percent now--with minority households and households from lower-income census tracts recording some of the largest gains in percentage terms.

However, for all its considerable benefits, the broadening of access to mortgage credit that has occurred during the past decade also had important negative aspects. Not surprisingly, given their weaker credit histories and financial conditions, subprime borrowers default on their loans more frequently than prime borrowers. The consequences of default may be severe for homeowners, who face the possibility of foreclosure, the loss of accumulated home equity, and reduced access to credit. In addition, clusters of foreclosures can lead to declines in the values of nearby properties and do great damage to neighborhoods.

During the past two years, serious delinquencies among subprime adjustable-rate mortgages (ARMs) have increased dramatically. (Subprime mortgages with fixed rates, on the other hand, have had a more stable performance.) The fraction of subprime ARMs past due ninety days or more or in foreclosure reached nearly 15 percent in July, roughly triple the low seen in mid-2005.[1] For so-called near-prime loans in alt-A securitized pools (those made to borrowers who typically have higher credit scores than subprime borrowers but still pose more risk than prime borrowers), the serious delinquency rate has also risen, to 3 percent from 1 percent only a year ago. These patterns contrast sharply with those in the prime-mortgage sector, in which less than 1 percent of loans are seriously delinquent. Higher delinquencies have begun to show through to foreclosures. About 320,000 foreclosures were initiated in each of the first two quarters of this year (just more than half of them on subprime mortgages), up from an average of about 225,000 during the past six years. Foreclosure starts tend to be high in states with stressed economic conditions and to rise where house prices have decelerated or fallen.

Adjustable-rate subprime mortgages originated in late 2005 and in 2006 have performed the worst, with some of them defaulting after only one or two payments (or even no payment at all). Relative to earlier vintages, more of these loans carried greater risks beyond weak borrower credit histories--including very high initial cumulative loan-to-value ratios and less documentation of borrower income. In addition, the sharp deceleration in home prices since 2005, including outright declines in some markets, left many of these more-recent borrowers with little or no home equity. In this situation, some borrowers (particularly owner-investors) may have found that simply walking away from their properties was their best option. Moreover, low home equity has made refinancing--the typical way for many subprime borrowers to avoid large scheduled interest rate resets--difficult or impossible for many. Thus, with house prices still soft and many borrowers of recent-vintage subprime ARMs still facing their first interest rate resets, delinquencies and foreclosure initiations in this class of mortgages are likely to rise further. It is difficult to be precise about the number of foreclosure initiations expected in coming quarters, as it will depend on (among other factors) the evolution of house prices, which will vary widely across localities. Historically, about half of homeowners who get a foreclosure notice are ultimately displaced from their homes, but that ratio may turn out to be higher in coming quarters because the proportion of subprime borrowers, who have weaker financial conditions than prime borrowers, is higher. The rise could be tempered somewhat by loan workouts.

The originate-to-distribute model seems to have contributed to the loosening of underwriting standards in 2005 and 2006. When an originator sells a mortgage and its servicing rights, depending on the terms of the sale, much or all of the risks are passed on to the loan purchaser. Thus, originators who sell loans may have less incentive to undertake careful underwriting than if they kept the loans. Moreover, for some originators, fees tied to loan volume made loan sales a higher priority than loan quality. This misalignment of incentives, together with strong investor demand for securities with high yields, contributed to the weakening of underwriting standards.

The fragmented market structure of mortgage originators in the subprime-lending industry may also have contributed. Data collected under the Home Mortgage Disclosure Act show that independent mortgage companies--those that are not depository institutions or their subsidiaries or holding company affiliates--made nearly half of higher-priced first-lien mortgages in 2006 but only one-fourth of loans that were not higher-priced. In addition, some sources report that the majority of mortgages are obtained through a broker, often an independent entity, who takes loan applications on behalf of a depository institution or other lender. The various lending institutions and brokers operate under different regulatory and supervisory regimes with varying intensities of enforcement effort. That fragmentation makes monitoring brokers and lenders difficult for regulators and investors alike.

Markets do tend to self-correct. In response to the serious financial losses incurred by investors, the market for subprime mortgages has adjusted sharply. Investors are demanding that originators employ tighter underwriting standards, and some large lenders are pulling back from the use of brokers. The reassessment and resulting increase in the attention to loan quality should help prevent a recurrence of the recent subprime problems. Nevertheless, many homeowners who took out mortgages in recent years are in financial distress. To help those borrowers, the Federal Reserve, together with the other federal supervisory agencies, has issued two statements--in April, to mortgage lenders; and earlier this month, to mortgage servicers--to encourage the financial industry to work with borrowers to arrange prudent loan modifications to avoid unnecessary foreclosures. The Conference of State Bank Supervisors (CSBS) joined the federal agencies in the second statement. Often, loan workouts are in the interest of all parties. We have also encouraged lenders and servicers to identify and contact borrowers who, with counseling and possible loan modifications, may be able to avoid entering delinquency or foreclosure. The simple step of reaching out to borrowers before they get into trouble can be very productive. In addition, a member of the Federal Reserve Board serves as a director of NeighborWorks America, which encourages borrowers facing payment difficulties to seek help by contacting their lenders, services, or trusted counselors. Recently, NeighborWorks America launched a nationwide advertising campaign to increase awareness of available support from their 24-hour hotline, and they are now responding to 2,000 calls a day, almost double the number in June.

Additionally, the Federal Reserve is working closely with community and industry groups around the country to reduce homeowners' risks of foreclosure. The community affairs offices in each of the Reserve Banks provide significant leadership and technical assistance. For instance, a public-private collaboration initiated by the Federal Reserve Bank of Chicago with Neighborhood Housing Services of Chicago and the City of Chicago produced the Home Ownership Preservation Initiative (HOPI), which began in 2003. In the ensuing three years, the HOPI program counseled more than 4,000 people, prevented 1,300 foreclosures, and reclaimed 300 buildings.[2] HOPI has also been a model for foreclosure prevention programs now operating around the country, including in Baltimore and Atlanta and in Ohio. As another example, the community affairs office of the Federal Reserve Bank of San Francisco recently convened a series of workshops to develop community-based solutions to mortgage delinquencies in six cities. More than 700 lenders, housing counselors, community group representatives, and government officials attended.

**Regulatory Responses**
The Federal Reserve takes responsible lending and consumer protection very seriously. Along with other federal and state agencies, we are responding to the subprime problems on a number of fronts. We are committed to preventing problems from recurring, while still preserving responsible subprime lending.

Last year, in coordination with other federal supervisory agencies, we issued principles-based guidance describing safety-and-soundness and consumer-protection standards for nontraditional mortgages, such as interest-only and negative-amortization mortgages. We subsequently issued illustrations to help institutions clearly communicate information to consumers. In June of this year the agencies issued supervisory guidance on subprime ARMs. The guidance describes standards that banks should follow to ensure that borrowers obtain loans that they can afford to repay and that give them the opportunity to refinance without prepayment penalty for a reasonable period before the interest rate resets. We have requested public comment on illustrations to help lenders implement this guidance.

The Board also is committed to providing more-effective disclosures to help consumers defend against improper lending. As I discussed in my testimony to this Committee in July, we recently issued proposed rules under Regulation Z, which implements the Truth in Lending Act (TILA), to improve disclosures related to credit cards and other revolving credit accounts. We are now engaged in a similarly rigorous review of TILA rules for mortgage loans and will be conducting extensive consumer testing of mortgage disclosures for this purpose. In my view, better disclosure of the schedule of mortgage payments over the life of the loan can help borrowers understand the terms of their mortgages and judge their ability to make future payments. Consumers may also benefit from better information about costs, including brokers' fees, when choosing among competing mortgage products. In addition, we are developing two sets of proposed changes to TILA rules--one to address concerns about incomplete or misleading mortgage loan advertisements and solicitations and a second to require lenders to provide mortgage disclosures more quickly so that consumers can get the information they need when it is most useful to them.

Improved and more timely disclosures may not be sufficient in some cases. As I discussed in July, we will use our rulemaking authority under the Home Ownership and Equity Protection Act to propose additional consumer protections later this year. We are looking closely at some mortgage lending practices, including prepayment penalties, escrow accounts for taxes and insurance, stated-income and low-documentation lending, and the evaluation of a borrower's ability to repay. The information that we gathered at a public hearing in June and from the subsequent comment letters has been extremely helpful.

The recent problems in subprime lending have underscored the need not only for better disclosure and new rules but also for more-uniform enforcement in the fragmented market structure of brokers and lenders. In that regard, the CSBS has partnered with the American Association of Residential Mortgage Regulators (AARMR) to develop a nationwide licensing system and database for mortgage professionals, and they have made considerable progress. The system is expected to start up in January 2008 with seven states, and another thirty states have committed and will be added gradually. Such a nationwide system would help limit the ability of originators who run afoul of their state regulators to continue operating simply by moving to another state.

Raising the quality of underwriting practices by all lenders to a uniformly high standard is an important objective. To that end, the Board and the other federal agencies worked with the CSBS to apply the two guidance documents I mentioned--on nontraditional mortgages and subprime ARMs--to state-supervised institutions. The CSBS published nearly identical guidance documents and has urged the states to implement them. Many states have done so, or are moving to do so.

To achieve strong and uniform enforcement, interagency cooperation among a variety of federal and state agencies is essential. As I noted in my testimony in July, the Board has launched a pilot program with the CSBS, AARMR, the Office of Thrift Supervision, and the Federal Trade Commission. The goal of this program is to expand and improve consumer protection by strengthening compliance reviews at selected nondepository lenders with significant subprime-mortgage operations. The Board will review nonbank subsidiaries of bank holding companies, and the other agencies will conduct similar reviews of nondepository institutions of thrift holding companies, independent mortgage lending companies, and mortgage brokers doing business with these entities. The reviews will include an evaluation of the companies' underwriting standards and senior-management oversight of the practices used for ensuring compliance with consumer protection regulations and laws. The agencies have been working closely together and are scheduled to begin the on-site reviews in the fourth quarter. The partner agencies will share information about the reviews and make joint assessments of lessons learned. This project should also lay the groundwork for various additional forms of future cooperation to ensure more effective and consistent supervision and consumer protection.

**Legislative Responses**

Beyond the actions underway at the regulatory agencies, I am aware that the Congress is considering statutory changes to help alleviate the problem of foreclosures. Modernizing the programs administered by the Federal Housing Administration (FHA) is one promising direction. The FHA has considerable experience in providing home financing for low- and moderate-income borrowers. It insures mortgages made to borrowers who meet certain underwriting criteria and who pay premiums into a reserve fund that is designated to cover the costs in the event of default. This insurance makes the loans less risky for lenders and investors, and it makes the loans eligible for securitization through the Government National Mortgage Association (Ginnie Mae).

Historically, the FHA has played an important role in the mortgage market, particularly for first-time home buyers. However, the FHA's share of first-lien home purchase loans declined substantially, from about 16 percent in 2000 to about 5 percent in 2006, as borrowers who might have sought FHA backing instead were attracted to nontraditional products with more-flexible and quicker underwriting and processing. In addition, maximum loan values that the FHA will insure have failed to keep pace with rising home values in many areas of the country.

In modernizing FHA programs, Congress might wish to be guided by design principles that allow flexibility and risk-based pricing. To alleviate foreclosures, the FHA could be encouraged to collaborate with the private sector to expedite the refinancing of creditworthy subprime borrowers facing large resets. Other changes could allow the agency more flexibility to design new products that improve affordability through features such as variable maturities or shared appreciation. In addition, creating risk-based FHA insurance premiums that match insurance premiums with borrowers' credit profiles would give more households access to refinancing options.

The risk of moral hazard must be considered in designing government-backed programs; such programs should not bail out failed investors, as doing so would only encourage excessive risk-taking. One must also consider adverse selection; programs that provide credit to only the weakest eligible borrowers are likely to be more costly than those that serve a broader risk spectrum. Risk-based insurance premiums or tighter screening and monitoring by lenders can mitigate adverse selection. But ultimately such mechanisms have their limits, and no government program will be able to provide meaningful help to the highest-risk borrowers without a public subsidy. Whether such subsidies should be employed is a decision for the Congress.

The government-sponsored enterprises (GSEs) Fannie Mae and Freddie Mac are, to a limited extent, assisting in subprime refinancings and should be encouraged to provide products for subprime borrowers to the extent permitted by their charters. However, the GSE charters are likely to limit the ability of the GSEs to serve any but the most creditworthy subprime borrowers. Indeed, if GSE programs remove the strongest borrowers from the pool, the risks faced by other programs--such as a modernized FHA program--could be increased.

Some have suggested that the GSEs could help restore functioning in the secondary markets for non-conforming mortgages (specifically jumbo mortgages, those with principal value greater than $417,000) if the conforming-loan limits were raised. However, in my view, the reason that GSE securitizations are well-accepted in the secondary market is because they come with GSE-provided guarantees of financial performance, which market participants appear to treat as backed by the full faith and credit of the U.S. government, even though this federal guarantee does not exist. Evidently, market participants believe that, in the event of the failure of a GSE, the government would have no alternative but to come to the rescue. The perception, however inaccurate, that the GSEs are fully government-backed implies that investors have few incentives in their role as counterparties or creditors to act to constrain GSE risk-taking. Raising the conforming-loan limit would expand this implied guarantee to another portion of the mortgage market, reducing market discipline further. If, despite these considerations, the Congress were inclined to move in this direction, it should assess whether such action could be taken in a way that is both explicitly temporary and able to be implemented sufficiently promptly to serve its intended purpose. Any benefits that might conceivably accrue to this action would likely be lost if implementation were significantly delayed, as private securitization activity would likely be inhibited in the interim.

**Implications for Financial Markets and Monetary Policy**

Most recently, as I am sure Committee members are well aware, subprime mortgage losses that triggered uncertainty about structured products more generally have reverberated in broader financial markets, raising concern about the consequences for economic activity. As I noted in a speech last month at the economic symposium hosted by the Federal Reserve Bank of Kansas City, the turbulence originated in concerns about subprime mortgages, but the resulting global financial losses have far exceeded even the most pessimistic estimates of the credit losses on these loans. These wider losses reflect, in part, a significant increase in investor uncertainty centered on the difficulty of evaluating the risks for a wide range of structured securities products, which can be opaque or have complex payoffs. Investors also may have become less willing to assume risk. Some increase in premiums that investors require to take risk is probably a healthy development on the whole, as these premiums have been exceptionally low for some time. However, in this episode, the shift in risk attitudes combined with greater credit risk and uncertainty about how to value those risks has created significant market stress. On the positive side of the ledger, past efforts to strengthen capital positions and financial market infrastructure places the global financial system in a relatively strong position to work through this process.

In response to these developments, the Federal Reserve moved in early August to provide reserves to address unusual strains in money markets. On August 17, the Federal Reserve Board announced a cut in the discount rate of 50 basis points and adjustments to the Reserve Banks' usual discount window practices to facilitate the provision of term financing

for as long as thirty days, renewable by the borrower.  The purpose of the discount window actions was to assure depositories of the ready availability of a backstop source of liquidity.  The Federal Reserve also took a number of supplemental actions, such as cutting the fee charged for lending Treasury securities.

Earlier this week, Federal Open Market Committee lowered its target for the federal funds rate by 50 basis points.  The action was intended to help forestall some of the adverse effects on the broader economy that might arise from the disruptions in financial markets and to promote moderate growth over time.  Recent developments in financial markets have increased the uncertainty surrounding the economic outlook.  The Committee will continue to assess the effects of these and other developments on economic prospects and will act as needed to foster price stability and sustainable economic growth.

**Footnotes**

1.  Estimates of delinquencies are based on data from First American LoanPerformance. Return to text

2.  "The Home Ownership Preservation Initiative in Chicago (HOPI): Reducing Foreclosures Through Strategic Partnerships," presentation by Bruce Gottschall, executive director, Neighborhood Housing Services of Chicago, June 25, 2007, http://nw.org/network/neighborworksprogs/foreclosuresolutions/documents/hopi_000.ppt. Return to text

▲ Return to top

2007 Testimony

Last update: September 20, 2007

**Home | News & Events**

Accessibility  Contact us  Disclaimer  Linking Policy  FOIA

PDF Reader