UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 12-10085-RWZ


CAPITAL VENTURES INTERNATIONAL

v.

J.P. MORGAN MORTGAGE ACQUISITION CORP., *et al.*


MEMORANDUM OF DECISION

February 13, 2013

ZOBEL, D.J.

In 2006 and 2007, plaintiff Capital Ventures International ("CVI") purchased

certificates in four residential mortgage-backed security ("RMBS") offerings. CVI now

sues the sponsors, depositors, and underwriters of those offerings under sections

410(a) and 410(b) of the Massachusetts Uniform Securities Act ("MUSA"), claiming

defendants violated MUSA by making material misstatements in the offering materials.

Defendants move to dismiss the complaint for failure to state a claim.

I.     **Background**

CVI is an investment entity headquartered in the Cayman Islands. Between 2006

and 2007, it purchased certificates in four RMBS offerings sponsored, issued, and

underwritten by the defendants in this case.[1] It paid a combined purchase price of over

---

[1] Specifically: Defendant EMC Mortgage LLC (formerly EMC Mortgage Corporation) sponsored three of the offerings at issue, and defendant J.P. Morgan Mortgage Acquisition Corp. sponsored the fourth; these two are the sponsor defendants. Defendant Structured Asset Mortgage Investments II Inc. was the depositor for two of the offerings at issue, Bear Stearns Asset Backed Securities I LLC was the depositor for the third, and J.P. Morgan Acceptance Corporation I was the depositor for the fourth; these

$143 million for these certificates.

The certificates were created in a multi-step securitization process. First, loan originators provided mortgage loans to borrowers who were buying homes or refinancing earlier mortgages homes. A sponsor then combined a large number of these loans into a loan pool. The sponsor sold the pool to a depositor, who transferred the loans to a trust. The trust then issued certificates back to the depositor, who sold the certificates to an underwriter, who sold the certificates to individual investors.

Each RMBS offering was accompanied by written offering materials, including a prospectus and prospectus supplement. These offering materials described the certificates being sold, the loans underlying the certificates, and the underwriting process used to originate those loans. CVI now sues based on alleged misrepresentations in these offering materials.

## II.    Legal Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The court accepts as true all factual allegations contained in the complaint, but not legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the complaint must allege sufficient facts to make the plaintiff's claim plausible. Id.

Defendants argue that CVI's claims sound in fraud and so must be pled with particularity. See Fed. R. Civ. P. 9(b). Of course, CVI's claims under section 410 of

_____

three are the depositor defendants. Finally, Bear, Stearns & Co. Inc. underwrote three of the offerings at issue, and J.P. Morgan Securities LLC (formerly J.P. Morgan Securities Inc.) underwrote the fourth; these two entities have now merged, leaving only the latter as the remaining underwriter defendant. All of the defendants are direct or indirect subsidiaries of JPMorgan Chase & Co.

MUSA are not fraud claims; unlike fraud claims, they do not require showing scienter or reliance. See Mass. Gen. Laws ch. 110A, § 410(a)(2), (b); Marram v. Kobrick Offshore Fund, Ltd., 802 N.E.2d 1017, 1026-27 (Mass. 2004). But a section 410 action may still be subject to Rule 9(b) if fraud lies at the core of the action—for instance, if a plaintiff brings fraud and non-fraud claims in "a single complaint of a unified course of fraudulent conduct." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996), abrogated in part on other grounds by 15 U.S.C. § 78u-4(b). Here, however, none of CVI's claims sound in fraud. The allegations that defendants knew their statements were false are not averments of fraud, absent any claim of scienter or reliance. Rule 9(b) therefore does not apply. See id.; see also Capital Ventures Int'l v. UBS Sec. LLC, Civil Action No. 11-11937-DJC, 2012 WL 4469101, at *7 n.3 (D. Mass. Sept. 28, 2012); Mass. Mut. Life Ins. Co. v. Residential Funding Co. ("MassMutual"), 843 F. Supp. 2d 191, 199-200 (D. Mass. 2012).

## III.   Analysis

Section 410(a)(2) of MUSA makes liable any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact." Mass. Gen. Laws ch. 110A, § 410(a)(2). Section 410(b) then extends liability to "[e]very person who directly or indirectly controls a seller liable under subsection (a)." Id. § 410(b). These MUSA provisions are modeled on similar provisions in the federal Securities Act of 1933 (the "Securities Act"), and the Massachusetts legislature has directed courts to interpret MUSA in accordance with its federal counterpart. MassMutual, 843 F. Supp. 2d at 199; Marram, 809 N.E.2d at 1025.

3

### A.      Alleged Misrepresentations

CVI claims that the offering materials at issue made material misstatements or omissions in four respects. First, the offering materials represent that the underlying loans were generally approved in accordance with acknowledged underwriting standards; CVI alleges that in fact the loan originators systematically disregarded those standards. Second, the offering materials represent that the underlying properties were valued according to standard appraisal procedures, and that the resulting loan-to-value ("LTV") ratios were reliable; CVI alleges that in fact the appraisals routinely failed to follow these procedures and produced systematically inflated values. Third, the offering materials represent specific owner occupancy rates for the underlying properties; CVI alleges that those rates were inflated. Finally, the offering materials provided a credit rating, issued by an independent agency, for each tranche of certificates being sold; CVI alleges that although the offering materials correctly reported these credit ratings, the ratings were false and misleading because they were based on the faulty data described above. Defendants argue that the offering materials were not false or misleading in any of these four respects.

### 1.      Underwriting Guidelines

First, CVI alleges the offering materials made misstatements relating to the underwriting guidelines used to approve the underlying mortgage loans. According to CVI, the offering materials indicated that the loans backing each certificate were originated in accordance with specified underwriting criteria. Those criteria considered such things as the borrower's credit report and credit score, the borrower's financial

stability, and the value of the property. The offering materials indicated exceptions could be made to the underwriting guidelines, but that any such exceptions were made on a case-by-case basis and depended on other compensating factors. CVI alleges these representations were false because in fact the loan originators systematically ignored the underwriting guidelines, issuing loans on the basis of overstated figures and granting exceptions in bulk regardless of any compensating factors.

As factual allegations supporting its claim, CVI states: (1) that there was a general incentive in the industry to violate underwriting guidelines; (2) that the underlying loans have suffered high rates of defaults and delinquencies, causing the certificates to drop from AAA ratings to "junk" status; (3) that third-party investigations by a due diligence firm and certain insurers found that defendants had regularly used loans that violated underwriting guidelines to back their certificates;[2] (4) that other evidence, including internal documents, statements by former employees, and government reports, shows that the principal originators of the underlying loans regularly violated the underwriting guidelines; and (5) that a loan-level forensic analysis of over 3,500 of the loans actually included in the four offerings at issue shows that occupancy rates and home values were frequently overstated.

Defendants make several arguments in response. First, they point out that the offering materials never represented that all the loans backing the certificates conformed with specific underwriting guidelines; the offering materials only described

---

[2] Defendants have moved to strike most of the allegations on this point as immaterial because they repeat allegations from other complaints. That motion lacks merit and is denied. See Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc., Nos. 11-2340-RDR & 11-2649-RDR, 2012 WL 3028803, at *35-36 (D. Kan. July 25, 2012).

the general practices of the originators, and explicitly noted that some loans reflected exceptions to those general practices. Furthermore, the offering materials disclosed that the loan pool purchase agreements contained "repurchase or substitute" provisions to cover loans that failed to meet contractual representations, implying that at least some loans would not meet the underwriting guidelines. See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 389 (5th Cir. 2010) ("repurchase or substitute" provisions imply that some loans will be delinquent). But CVI does not allege that originators only made occasional exceptions to the stated underwriting guidelines; it alleges that originators utterly disregarded those guidelines. As the First Circuit recently held, "saying that exceptions occur" does not warn against "a wholesale abandonment of underwriting standards." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp. ("Nomura"), 632 F.3d 762, 773 (1st Cir. 2011). The disclosures here are substantially similar to those the First Circuit considered in Nomura; and here as there, they do not foreclose a wholesale abandonment claim. See id.; see also Capital Ventures, 2012 WL 4469101 at *4-6; MassMutual, 843 F. Supp. at 202.

Defendants next argue that CVI's factual allegations are not enough to make its claim plausible. In Nomura, the First Circuit held a claim of wholesale abandonment plausible where the plaintiffs alleged "fairly specific" practices of ignoring underwriting guidelines and "link[ed] such practices with specific lending banks that supplied the mortgages." Nomura, 632 F.3d at 773. The plaintiffs there alleged that one primary originator routinely violated its underwriting guidelines by, inter alia, "scrubbing" loan

applications of disqualifying material and ignoring whether borrowers showed an established ability to repay. Id. at 772. The First Circuit held that these allegations, in conjunction with the sharp drop in the credit rating of the plaintiffs' certificates, stated a claim. Id. at 773-74.

Here, like the plaintiffs in Nomura, CVI has alleged specific practices violating the underwriting guidelines; for instance, they claim the principal originators pervasively misrepresented borrowers' income and assets, and made routine exceptions without compensating factors.[3] CVI has also linked those practices to the principal originators of the loans underlying its certificates, citing internal documents and statements by former employees. See id. at 773 (referring to "statements from confidential witnesses, former employees, and internal e-mails" as "substantial sources" for such allegations). Furthermore, CVI has linked the alleged practices directly to the loans underlying its own certificates. Like the Nomura plaintiffs, CVI has alleged a drop in its certificates' credit ratings. It has also alleged that a forensic analysis of 3,500 loans underlying its certificates shows systematic overstatement of owner occupancy and home values. These allegations are more than sufficient to state a plausible claim that the stated underwriting guidelines were widely ignored, making the offering materials false or misleading. See Capital Ventures, 2012 WL 4469101 at *6 (finding that similar allegations state a claim); MassMutual, 843 F. Supp. 2d at 202

---

[3] Defendants note that CVI makes no allegations against one originator, Fifth Third Mortgage Co., who originated about a quarter of the loans in one of the four offerings at issue. But CVI makes sufficient allegations against the originators who produced the other three-quarters of the loans in that offering (and all the loans in the other offerings), such that the offering materials would be misleading if CVI's allegations are true.

(same).[4]

## 2.    Appraisals and LTV/CLTV Ratios

CVI next alleges the offering materials made misstatements relating to the appraisals of the mortgaged properties, and the resulting loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios.[5] CVI alleges the offering materials represented that all the mortgaged properties were appraised according to professional standards, and that they reported summary LTV and CLTV statistics based on these appraisals. CVI further alleges that these representations were false. It claims defendants knew the appraisers were actively manipulating the appraisal process (contrary to professional standards) to report inflated home values. Likewise, it claims defendants knew that the reported LTV and CLTV ratios based on these appraisals were exaggerated.

The primary support CVI alleges for this claim is an automated valuation model ("AVM") that it used to value the actual worth of the underlying mortgaged properties at the time the loans were originated. According to the AVM, one in three of the mortgaged properties had its appraised value inflated by more than ten percent, and one in ten had its appraised value inflated by more than twenty-five percent. CVI also alleges generally that there were substantial incentives to inflate appraised values, that third-party investigations found the originators at issue systematically used inflated

---

[4] At oral argument, defendants quoted statistics from one of the internal investigations cited in the complaint to argue that most of the loans backing CVI's certificates met underwriting guidelines. However, other investigations also cited in the complaint showed much higher rates of underwriting misbehavior by the originators at issue. Taking the facts alleged in the light most favorable to CVI, it has adequately plead a widespread disregard of underwriting standards.

[5] The LTV ratio is the amount borrowed divided by the value of the mortgaged property. The CLTV includes all loans that the property secures, not just the first mortgage. A lower LTV and CLTV thus indicate a safer loan with better security.

appraisal values, and that the poor performance of the certificates plausibly links these general problems with the specific loans underlying the certificates.

Defendants first argue that the appraisals were non-actionable statements of opinion. That argument misses the mark. CVI contends the offering materials represented that the appraisers applied professional standards; that statement about the standards the appraisers used is an actionable statement of fact. See Capital Ventures, 2012 WL 4469101 at *9; MassMutual, 843 F. Supp. 2d at 203. Furthermore, although the appraisals themselves are opinions, "[a]n opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." Nomura, 632 F.3d at 775. Here, CVI alleges that the appraisal values were actively manipulated to justify issuance of the loan, meaning that the values did not represent the appraisers' actual subjective belief and had no real basis in fact. If those allegations are true, the appraisals are actionable opinions. See Capital Ventures, 2012 WL 4469101 at *10; MassMutual, 843 F. Supp. 2d at 203-04.

Second, defendants argue the offering materials disclosed that appraisals and LTV/CLTV ratios might be inaccurate because property values fluctuate over time. But a warning that property values fluctuate over time is simply not the same as a warning that appraisal values have been systematically inflated. See Capital Ventures, 2012 WL 4469101 at *9; MassMutual, 843 F. Supp. 2d at 203.

Finally, defendants argue that CVI's appraisal- and LTV/CLTV-based claims are not plausible. But the claims are supported by factual allegations regarding the general

state of the appraisal industry at the time, third-party investigations discussing

appraisal practices of four of the principal originators at issue, and the AVM results for

the specific loans underlying CVI's certificates. General allegations about the industry

would not state a claim on their own, see Nomura, 632 F.3d at 773; here, however, CVI

has supported its claims with specific allegations about the originators and loans at

issue. Those allegations make its claim plausible. See MassMutual, 843 F. Supp. 2d at

204.[6]

### 3.     Owner Occupancy

Third, CVI alleges the offering materials misrepresented the owner-occupancy

rates of the underlying loans. Loans secured by a property in which the borrower lives

are less likely to default, making this an important metric for purchasers of RMBS

certificates. CVI alleges that a forensic analysis of the specific loans underlying its

certificates shows that the owner-occupancy rates reported in the offering materials

were substantially inflated.

Defendants argue that the offering materials were not misleading because they

included a disclaimer stating that the owner-occupancy rates were based upon the

borrowers' representations, and the complaint does not allege the offering materials

inaccurately reported those representations. But the materials for two of the offerings at

issue, called BALTA 2005-9 and BALTA 2006-4, included no such disclaimer; as such,

---

[6] Defendants challenge the AVM used by CVI, claiming its results shed no light on the issue because its methodology is so different from the process used by human appraisers. But that factual dispute is premature on a motion to dismiss. See Capital Ventures, 2012 WL 4469101 at *10; MassMutual, 843 F. Supp. 2d at 204. At this stage, in any case, CVI need only make its claim plausible. See Iqbal, 556 U.S. at 677-78. The AVM adds to the plausibility of CVI's claim even if its methodology is not the same as a human appraiser's.

CVI's claims clearly move forward as to these two offerings. Capital Ventures, 2012 WL 4469101 at *7-8; MassMutual, 843 F. Supp. 2d at 214. As for the other two offerings, CVI specifically and plausibly alleges that defendants knew borrowers were misrepresenting their intent to live at the mortgaged properties. That allegation defeats defendants' motion to dismiss, since defendants who know a certain representation is false "cannot simply claim that [they] blindly reported information given to [them] by third parties and thereby avoid liability for inaccuracies." Fed. Housing Fin. Agency v. UBS Americas, Inc. ("FHFA"), 858 F. Supp. 2d 306, 330 (S.D.N.Y. 2012); see also Capital Ventures, 2012 WL 4469101 at *8.

### 4.      Credit Ratings

Finally, CVI alleges the offering materials made actionable misrepresentations regarding the credit ratings for the certificates in each offering. These credit ratings, also known as investment ratings, were third-party opinions by independent ratings agencies regarding the riskiness of the certificates. CVI alleges that the defendants made material misstatements by including the ratings in their offering materials, because (CVI alleges) defendants knew the ratings were based on faulty data including the appraisal values and owner-occupancy statistics described above.

The First Circuit dismissed a similar claim in Nomura, where the plaintiffs likewise alleged that the ratings were misleading because they were based on inaccurate loan information. See Nomura, 632 F.3d at 774-75; see also Capital Ventures, 2012 WL 4469101 at *11 n.5 (quoting the Nomura plaintiffs' allegations). The plaintiffs in that case failed to state a claim because "the ratings . . . were accurately

reported by defendants and nothing more is required so long as the ratings were honestly made, had some basis, and did not omit critical information." Nomura, 632 F.3d at 775-76. The First Circuit particularly emphasized that "the complaint stops short of alleging expressly that the leadership of [the ratings agencies] believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated." Id. at 775.

The plaintiffs' claims in Nomura thus focused on the knowledge and subjective belief of the ratings agencies—and their claims failed, because they did not allege that the ratings agencies knew the data was faulty or disbelieved the ratings. Here, by contrast, CVI's claim focuses on the knowledge and belief of the sponsors, depositors, and underwriters who put out the offering materials. CVI claims the defendants knew that the underlying data was faulty and so that there was no real basis for the credit ratings. In addition, CVI argues, defendants did not subjectively believe the ratings.[7] These allegations state a claim because, as discussed above, defendants cannot simply repeat opinions they know are inaccurate or baseless and then disclaim liability. See In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 772 (S.D.N.Y. 2012) ("If Bear Stearns knowingly fed incomplete or inaccurate information to the Rating Agencies . . . the ratings' unqualified reproduction in the Offering Documents would constitute an actionable misrepresentation and omission."); cf. Capital Ventures, 2012 WL 4469101 at *11-12 & n.7 (dismissing with leave to

---

[7] CVI did not explicitly plead that defendants subjectively disbelieved the credit ratings. But given that CVI alleges defendants knew the ratings were based on faulty data, it would be hypertechnical to require that CVI also explicitly plead defendants' disbelief. See In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 772 (S.D.N.Y. 2012).

amend so plaintiff could allege defendants did not reasonably believe the ratings).

Likewise, CVI claims defendants at least implicitly represented that the credit ratings were based on accurate data about the loans, while knowing that the underlying data had been manipulated. Defendants' representations about the process by which credit ratings are generated may be actionable even if the opinion expressed by the rating is not. Cf. MassMutual, 843 F. Supp. 2d at 203 ("A representation that certain specific standards will be used to generate appraisals is itself an actionable statement of fact."). CVI therefore states a claim on this theory.

**B.    Materiality**

Defendants also argue that even if CVI has identified any misrepresentations, the misrepresentations were not material. A statement or omission is material if there is a substantial likelihood that it "would have been viewed by a reasonable investor as significantly altering the 'total mix' of information made available." Marram, 809 N.E.2d at 1030 (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989)). Materiality can in extreme cases be determined as a matter of law. See Glassman v. Computervision Corp., 90 F.3d 617, 632 n.22 (1st Cir. 1996). But where, as here, the alleged misrepresentations are not "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality," the issue requires further factual development. Marram, 809 N.E.3d at 1030 (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 450 (1976); see Capital Ventures, 2012 WL 4469101 at *12; MassMutual, 843 F. Supp. 2d at 209 n.12.

**C.    Statute of Limitations**

Defendants next contend that CVI's claims are untimely. Claims under section 410 of MUSA are subject to a four-year statute of limitations. Mass. Gen. Laws ch. 110A, § 410(e). The parties entered into a tolling agreement on October 12, 2011, which was extended until the complaint was filed; thus, CVI's claims are untimely if they accrued before October 12, 2007.

Defendant argues that CVI was on notice of its claims by October 2007, based on newspaper articles, government publications, and media reports that appeared before the critical date. These documents noted the widespread erosion of underwriting guidelines in the mortgage market, the pressure on appraisers to generate inflated property values, and pervasive misrepresentation of owner occupancy. Certain sources also associated the erosion of underwriting guidelines and increased default rates with the primary originators whose loans backed CVI's certificates. Furthermore, defendants point out that CVI received monthly trustee reports giving data on the specific loans underlying its certificates. Those reports showed a marked increase in delinquency and default rates as the market worsened from 2006 through October 2007.

Dismissing a complaint as time-barred is appropriate only where the facts "leave no doubt" that the statute of limitations has run. Warren Freedenfeld Assocs. v. McTigue, 531 F.3d 38, 44 (1st Cir. 2008) (quoting LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998)). Defendants have not carried that heavy burden here. None of the public sources available specifically charged the primary originators here with the practices alleged in the complaint, nor would the poor performance of the underlying loans have necessarily alerted CVI to the alleged abandonment of

14

underwriting guidelines. See Capital Ventures, 2012 WL 4469101 at *12-13;

MassMutual, 843 F. Supp. 2d at 208-09.[8]

### D. Sponsor and Depositor Defendants

Section 410(a)(2) of MUSA extends liability only to any person who "offers or

sells" securities. That language clearly includes underwriter defendant J.P.Morgan

Securities LLC, whose predecessors directly sold CVI the certificates. But defendants

argue it does not include the sponsor and depositor defendants.

For MUSA, as for section 12(a)(2) of the Securities Act, a person "offers or sells"

securities if he "successfully solicits [their] purchase, motivated at least in part by a

desire to serve his own financial interests or those of the securities owner." Pinter v.

Dahl, 486 U.S. 622, 647 (1988); see Capital Ventures, 2012 WL 4469101 at *14;

MassMutual, 843 F. Supp. 2d at 205. For instance, the statute clearly reaches a broker

who solicits a sale on commission. Pinter, 486 U.S. at 646. But it does not reach

"participants only remotely related to the relevant aspects of the sales transaction" who

are merely "involve[d] in the securities transaction and its surrounding circumstances."

Id. at 651. The relevant inquiry focuses on the defendant's relationship with the

plaintiff-purchaser, not his relationship with other defendants or the product eventually

---

[8] The parties dispute whether the statute of limitations for section 410 of MUSA is tied to inquiry notice or to the discovery rule. The former begins the limitations clock when "a reasonable investor would have noticed something was 'amiss,'" Marram, 809 N.E.2d at 1027 n.20; the latter begins it when the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts that form the basis for the action. See Merck & Co. v. Reynolds, 130 S. Ct. 1784, 1797-98 (2010). The courts are divided on which standard applies. Compare, e.g., MassMutual, 843 F. Supp. 2d at 208 (inquiry notice), with Capital Ventures, 2012 WL 4469101 at *13 (discovery rule). The court need not resolve that question here, however; even under the more defendant-friendly inquiry notice standard, defendants have failed to "leave no doubt" that CVI's claim is time-barred. See McTigue, 531 F.3d at 44; MassMutual, 843 F. Supp. 2d at 208-09.

sold. MassMutual, 843 F. Supp. 2d at 206; see Pinter, 486 U.S. at 651; Shaw, 82 F.3d at 1216.

CVI alleges that the sponsor and depositor defendants "worked collectively" with the underwriters and trusts "to market and sell the [c]ertificates," and that they profited from the sales. Docket # 1 ("Complaint") at ¶¶ 215-16. Its theory is that all of the defendants jointly solicited it to purchase the certificates. But the conclusory allegation that defendants "worked collectively" to market and sell the securities, unsupported by facts showing actual solicitation by the sponsor or depositor defendants, will not survive a motion to dismiss. Shaw, 82 F.3d at 1216; Capital Ventures, 2012 WL 4469101 at *14; MassMutual, 843 F. Supp. 2d at 206.

In addition, CVI alleges that the sponsor and depositor defendants had various roles in preparing the certificates. It alleges the sponsors acquired the mortgage loans, transferred them to the depositors, and prepared the offering materials, while the depositors accepted the mortgage loans from the sponsors, transferred them to the trusts (which they controlled), created and issued the certificates, and filed registration statements with the SEC. Furthermore, CVI alleges that this was an integrated and regularly repeated process, with close and longstanding business ties between each entity.

But none of these allegations show any relationship connecting the sponsor and depositor defendants with CVI. See Capital Ventures, 2012 WL 4469101 at *14; MassMutual, 843 F. Supp. 2d at 206-07 ("Plaintiff's allegations here—all of which deal primarily with Defendants' involvement in the securities transactions—are insufficient to

allege the type of relationship between Defendants and Plaintiff that is necessary to survive a motion to dismiss.) Because these allegations do not show the sponsor and depositor defendants themselves solicited CVI, they cannot support liability under section 410(a)(2) of MUSA.

As to the depositor defendants, CVI raises a second argument based on SEC Rule 159A. That rule was adopted in 2005, seventeen years after the Supreme Court's decision in Pinter. As pertinent here, it states:

> For purposes of section 12(a)(2) of the [Securities] Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of [any required prospectus filed by the issuer].

By the plain terms of that regulation, the issuer of a security is considered to "offer or sell" that security to any person who buys it in a primary offering. If that regulation applies here, then the depositor defendants—who issued the certificates that CVI bought—would be liable even if they did not directly solicit CVI.

Although Rule 159A has been in force since 2005, courts have applied it only seldom. See MassMutual, 843 F. Supp. 2d at 207 ("While this Rule would seem to bear directly on the issue, only two courts have applied [it] . . . . Numerous other courts that have considered this question—including courts in this circuit—have applied the Supreme Court's decision in Pinter to find that an issuer is not a statutory seller, without even mentioning Rule 159A.") Several decisions have explicitly rejected the Rule 159A analysis on the ground that it conflicts with the Supreme Court's holding in

Pinter. See, e.g., id. ("While an SEC regulation is, of course, entitled to consideration, it cannot countermand a contrary Supreme Court holding."); see also Capital Ventures, 2012 WL 4469101 at *14 n.9 (same).

But an agency's regulation interpreting a statute can supersede a contrary court holding, if the statute is ambiguous and the agency's interpretation is reasonable. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005). Pinter did not specifically consider the liability of an issuer in a primary offering, and so its holding is not squarely opposed to the agency's rule. But even if Pinter were directly contrary to Rule 159A, Pinter never held that its interpretation "follow[ed] from the unambiguous terms of the statute." Brand X, 545 U.S. at 982. As such, the agency's regulation should control, because the scope of the term "offer" is necessarily somewhat ambiguous and the agency's interpretation as expressed in Rule 159A is reasonable.

Through Rule 159A, the SEC has interpreted section 12(a)(2) of the Securities Act to cover any issuer who sells a new security in a primary offering, regardless of the underwriting method used. Because MUSA must be read to mirror its federal counterpart, see Marram, 809 N.E.2d at 1025, the depositor defendants are liable in accordance with that interpretation under section 410(a)(2) of MUSA. See FHFA, 858 F. Supp. 2d at 333-34.[9]

CVI's claims under section 410(a)(2) of MUSA are therefore dismissed as to the

---

[9] Defendants do not advance any other reason why Rule 159A would not apply here. For example, they do not argue that the certificates were not sold to CVI in a primary offering, or that the depositors are not "issuers" under Rule 159A.

sponsor defendants but not as to the depositor defendants.

### E.    Control Person Liability

As noted above, section 410(b) of MUSA extends liability to any person who "directly or indirectly controls" a person liable under section 410(a). Mass. Gen. Laws ch. 110A, § 410(b). CVI alleges that the sponsors and depositors are liable under this provision because the sponsors controlled the depositors, and because both the sponsors and depositors controlled the trusts.

The second part of this argument clearly fails, because CVI has not alleged any facts showing the trusts violated section 410(a). See Capital Ventures, 2012 WL 4469101 at *15 (failure to plead a primary violation of section 410(a) negates control liability under section 410(b)); MassMutual, 843 F. Supp. 2d at 207 (same). The complaint does not allege that the trusts directly solicited CVI or sold it any securities. And as discussed above, the conclusory allegation that the trusts "worked collectively" with other defendants to solicit CVI does not state a section 410(a) claim.

Defendants also argue that CVI has not adequately alleged facts showing the sponsor defendants controlled the depositor defendants. But CVI has supported its allegation that the sponsors "had day-to-day control" over the depositors, Complaint ¶ 221, with details about how the depositors were organized and managed. For instance, the complaint alleges: "The 'depositor' is typically a special-purpose affiliate of the 'sponsor,' and exists solely to receive and pass on the rights to the pools of loans. Indeed, the management of the depositor and sponsor often overlap with each other and their bank affiliates." Complaint ¶ 28. Likewise, the complaint explains how

19

the sponsors exercised that control:

> The sponsors acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the depositors and then to the trusts. The sponsors also determined and approved the structure of the securitizations and the manner in which the depositors and the trusts sold the related Certificates, and controlled the disclosures made in connection with the related securitizations.

These allegations state sufficient "indicia of the exercise of control," Aldridge v. A.T. Cross. Corp., 284 F.3d 72, 85 (1st Cir. 2002), to plausibly state a section 410(b) claim against the sponsors for controlling the depositors.[10]

## IV.    Conclusion

Defendants' motion to dismiss (Docket # 12) is ALLOWED IN PART AND DENIED IN PART. CVI's claims against the sponsor defendants under section 410(a) of MUSA are dismissed. CVI's claims against the depositor defendants under section 410(b) are also dismissed, as are its section 410(b) claims against the sponsor defendants to the extent they rest on the sponsors' control of the trusts. The motion is denied in all other respects.


     February 13, 2013                 /s/Rya W. Zobel

           DATE                     RYA W. ZOBEL

                                UNITED STATES DISTRICT JUDGE

---

[10] That claim is dependent, of course, on the primary section 410(a) claim against the depositors as "sellers" under Rule 159A. See supra Part III.D.